Next case on today's platform, sorry to keep you waiting, Peoples v. Ivan Black, and we have Mr. McCormick and Mr. McCormick. Good morning. Good morning. You may proceed. Thank you. My name is Monroe McCord. I have the appellate, Mr. Black. Please support the counsel. I want to talk about my first count of my appeal and talk about it in relation to the third count also. The issue that came up in court, my client was pro se. Of course, that makes everything, I don't know if the word is more interesting, but it makes it more difficult. My client had consistently asked throughout the pretrial proceedings, he had consistently asked for copies of videos or audio tapes, DVDs, whatever. I think he was aware that in the police report, there was a reference in the police report that there was a videotape and it was identified as 12-07-60. And he wanted this. The record, I believe, supports the position that this recording, this video according to the state police was given to the state at some point in the proceedings. Then we got down to the trial in July of 2010. And my client was still asking for that. And they said, well, we'll check and see. And then the state police say, we can't find it. There had been reference to it being given to the state. The state says, we don't have it. And my client was basically cut out of making the argument that and making a record that he said things or did things in the presence of the police officer, was taken down on the video, taken down on the DVD. And he was not able to argue certain things, such as if he made a statement that he thought he was being frank. In the report, it wasn't clear from the record whether or not there actually was such a video. I thought there was a contention by the state or the state police that there was no video ever logged. I believe there were references. There's clearly a reference on the police officers, the troopers' report. And it referenced 120760. So that, to me, says there was an existence of a video. And I believe... And that says to you, but was there any support for that trial? No. The state denied... I mean, support in the sense that somebody said if there's a number, a corresponding number, that means a video exists? That exchange never happened. My client said he remembered there was a red flashing light when the trooper was talking to him after the incident.  And it was my understanding from reviewing the record that the state, in effect, admitted that there was, in fact, a video that they had at some point sent it to the state. Or sent it to the department. The state police admitted there was a video. They sent it to the state's attorney. And the state's attorney never acknowledged that they received it or anything. Then they went back on July 2nd, I think, the second day of trial. And they went through this back and forth to say, we can't find it. The state police can't find it. The state's attorney said, we have no record that we ever received it. But the police officer had made a record that there was such a video. More evidence that the video was in existence, Your Honor, I'm not sure. I believe the record is... The state police gave it to the state's attorney? I believe that's what... That's what you said? I believe that's what the record said at some point. That the state police officer had sent it to the, I think his name was Jordan. They'd given it to the, or had mailed it to the state's attorney. And I'm not sure what page that is on the record, Your Honor. But, and then nothing happened. But throughout this entire time, the state had continued to deny that there was ever any video in existence. And all the state had to do was look at the police officer's report and say, well, it says right here, it's 1270-60. There's at least a reference to it. They made no effort to run it down. And in my brief, I make acknowledgment to the fact that even in another case my client was involved with, they made reference to the videos as DVDs or CDs. And that he believed that the state was going through a pattern of consistently not fully cooperating in the production of these videos. Or discovered. Because in his CN case, which was 09-CM-96, there was a recorded conversation between Mr. Black, the inhabitants of his house, and the police. And it went back and forth. And his position is, is they did not give him a complete record of that DVD from this misuse. So that sets the precedent here of what's going on. Sets the table for what's going on. When you go back to the fact that he was prevented from really asking about why he wasn't given the video, the court determined that there was no video in existence. But the records are inconsistent with that. So he could not argue in his defense. He could not argue the things he wanted to argue. Likewise, it was his intention to use the book, which talked about the law enforcement officer's obligations to be unbiased and not prejudiced, in the way he conducted his investigation. And that they stopped him from doing it. His point was, as of the day of trial, your report says there is a video in existence. As of the day of trial, you did not give me that video. Your job is not to frame the defendant or not prepare a case consistent with what the state wants to do. Your job is to be fair, unbiased, and be basically a truth-seeking process. He was denied his ability to do that, and he stopped from reading what the duties for the law enforcement officer would have been. And his theory is, and we know what, under Supreme Court Rule 12, we know what an opening statement is about, and you get a chance to make reference to reasonable inferences of what we expect the facts to show. And he was prevented from doing that. So one and three go together. Going to my count, number two, with regard to the conviction based on the fact that they say that the state proved that Mr. Wilson was 60 years old or older. If you look at the record, Judge Swarm went through a substantial amount of dialogue back and forth with the state saying, how is this proven? And he had some questions. Ultimately, he decided to sentence the defendant on count two, which doesn't have any reference to the age issue, a vehicular invasion. But the record is devoid of any reference that showed that my client knew or should have known. And they say, well, you could inferentially determine these things that the guy was sober 60 years old. But that's not the standard of proof. To prove a case beyond a reasonable doubt. I know circumstantially you could derive these things, but there's nothing in there that my client was on notice this guy was over 60 years old. Lastly, with regard to the sentence, my client, you can see from the record, we were there four different days. The state put on four witnesses and tons of evidence, but the witnesses were, it was like a mini trial. I asked for discovery based on the things that the state was going to present, the list of witnesses, what they were going to testify to. Nothing says that I'm obligated to get that. Nothing says that I'm obligated to have information given to me. But in the interest of judicial time, I thought it would be nice to have and be able to prepare. And I was denied that opportunity. We went from October until the Friday before Thanksgiving until the Monday before Thanksgiving on November 22nd. And we went through all this. And in our case in mitigation, we presented unreported medical evidence that my client was medically in pro. That he was suffering from cardiovascular disease. That he really didn't need to be incarcerated, either DOC or in the camp. Folks, I may be wrong on this, but this was basically two people fighting. One guy got punched in the nose. You can have a nosebleed when you blow your nose. It doesn't take much trauma. Based on this punch in the nose, he got 100 days in jail, which equates to basically 200 days. If he had been sentenced to a year in apartment correction, generally the things they're working with with regard to credit and that sort of thing, he would have been out in 60 to 70 days. Here he got stuck in jail for 100 days. I'm not saying that he was right to hit the man. I'm not saying that it was okay for him to do it. But there is evidence that he, in fact, was, and I'll betray my agrarian roots, but when farmers get stirred up about farming, they can be difficult to deal with. And you're stopping one person from getting where they need to go. Farmers can indeed be irrational. And I think that's what happened in this situation. But the jury did not believe that my client was struck first or that Mr. Wilson swung the door at him first. But my client became very upset that he was not able to get to do his farm work. It's not something that's completely unexpected in a situation like this. But 100 days seems abusive discretion. I'm not saying you couldn't do it. I'm just saying it seems too much when all it is is one person, one punch. No question that there was no medical damage. No question that there was no physical injury to the man. Did you talk to the trial judge again? Sir? Did you go and talk to the trial judge after the sentence? Yeah, I did a motion to reconsider. Tell her the same thing you're telling us here? Pit effect, yeah. But as I'm doing the motion and post-trial motions, and I'm doing the motion to reconsider, my client continues medically to deteriorate. And I continue to tell him, you are not equipped to deal with a man who has cardiovascular disease. You're not equipped to deal with a man consistent with what the nurse specified to you about this man's condition. This is an excessive sentence. And then his medical condition continued to deteriorate. He experienced a heart attack and or a stroke sometime around December 10th, which I think was a Friday. And then they took him to the hospital after he laid in his cot in his room for three days. On Monday the 13th, they decided that now they were going to take him. He went from a situation where he didn't have major onset of angina and all these type things. He went into that. They weren't properly equipped to take care of that.  Eventually, if you look at the record, you'll see that sometime along in January or February, March, they released him. I wasn't there. On their own motion, they released him so they could walk him into a helicopter and they could fly him to St. Louis. Because they didn't want to pay for it. And everybody there knew that he had medical conditions and he shouldn't be stuck in a county jail for that many days at least. If it's coming across as a motion to reconsider, Judge, it's not meant to be that way. It's stating facts that show that this is an excessive sentence. It's against the manifest way of the evidence. How many days does he have right now? How many days did he actually do? I think he did about 65. And then he did the malice on home confinement after his medical conditions deteriorated. After he did go to the hospital twice. I think they might have even put some new stints in him. I don't think this merited 100 days. I think it's against the manifest way of the evidence. I think there were things that were done that should not have been done to this man. Especially in light of his medical conditions. I'm not advocating that he was right to punch the guy if that's the way the evidence panned out. I'm not saying that he was right to hurt a gentleman like that. But it happened. He was found guilty of it. Four felonies. And I think it's at variance with the spirit and purpose of the statute. And it's manifestly disproportionate. It was not a substantial blow to the face. There was no physical harm. And based on that, I think it's against the abuse of discretion. Those are my arguments. Thank you, Mr. McCord. You'll have the opportunity to do that. Thank you. I'll try to get you to lunch on time. Ms. Camden, I misidentified you, I think, earlier. Did I get you confused with Ms. McCormick in the audience? Yes. Thank you. Okay. Thank you, Your Honor. May I please have the floor? Jennifer. Jennifer Camden on behalf of the state. With regard to Issue 1, the trial court did find that there was no videotape of the defendant's arrest and, therefore, no discovery of violation. These findings of fact are viewable for manifest wit of the evidence. And there's no evidence in the record contradicting the trial court's finding. While there is a police report form that contains a videotape or a number in a box that states videotape, there's nothing in the record establishing the criteria for entering this information into the box. Further, there's a box next to it that states simply copies to, and then the box states Fayette County State's Attorney. So then the record shows that we will send nothing but we'll put a number on it to the state's attorney. Is that what you're saying? We number nothing? I'm sorry, Your Honor. You're putting a number on nothing, but that we're going to send that nothing, which has a number, to the state's attorney. Is that what you're saying? Well, Your Honor, it says copies to state's attorney. Of what? Of nothing. It's not clear, Your Honor, whether it means copies of the form. But what's that number mean? There's no evidence in the record stating what that number means, Your Honor. It's in a box marked video, but there's... So it's a video number of we don't know. Are we of nothing? We don't know what the number means, Your Honor. So nobody testified from the state police that their custom and practice was to number videos and put that in the box or to put numbers in the box when there weren't videos. There was no testimony at all, one way or the other. That's correct, Your Honor. The court at the hearing took several recesses so that the state's attorney could contact the state police by telephone, speak to the arresting officer, speak to the state police headquarters, and the results of these investigations resulted in a letter being sent from the Master Sergeant Corey Risfet, District 12 Administrative Officer, to the state's attorney's office saying, and this is on page 7 of the People's Answer Brief, Your office requested a copy of videotape 12-7-260, reference our appeal report. Unfortunately, we have been unable to locate this tape. According to our tape log, the tape was never received, therefore we'll be unable to honor your request. If the tape is located in the near future, you will be notified. Because the tape was never, because no tape was ever logged, there was no proof in the record that a tape ever existed, and it was for this reason that the court found that there was no video and denied the defendant's motion for discovery sanctions. Well, it doesn't mean it was never taken. That means it was never found. To me it sounds like something might have been lost and never found in what they said, not that there never was one. That's what I'm trying to think. I suppose anything is possible, Your Honor, but there wasn't evidence that there was a tape and that the tape was found. Well, the evidence was there was never found. Or it wasn't logged. Logged to me means that it was probably somehow categorized or placed in some kind of custody or something. Well, what we do know is that, from the record, is that the state and the state police worked together to try to investigate the matter. Contrary to the defendant's statement today that the state made no effort to run it down, there were several recesses taken when the state did try to run it down and the state police responded that no tape was ever logged. The trial court found that there was no video and denied the defendant's motion for discovery sanctions. And even if there was a discovery violation, the question on appeal would be whether the defendant was prejudiced and whether the court failed to eliminate that prejudice. And it's important to note that the alleged tape would have been of an arrest, not of the crime itself. The police responded later and that no issue regarding the arrest was an issue at trial. The defendant on appeal claimed that the tape contained some conversation between himself and the arresting officer in which the defendant set forth facts of self-defense, but below, the circuit court asked the defendant what he would have proven by that videotape had it existed, had it been found, had it been discovered. The defendant said he could not say exactly what he would have said or what would have been on the tape. Also, the court said that the defendant could cross-examine Officer Jordan related to any matter that would have helped the defendant at trial. And the defendant did not cross-examine Jordan about any materials he claimed were contained on the videotape of the arrest. With regard to Issue 3, the opening statement purpose is to apprise the jury of the expected evidence and reasonable inferences from that evidence. And counsel cannot refer to facts that he cannot prove. And the trial court did note that the defendant could not prove that there was a video or that it had not been turned over. So the court was within its discretion in barring the defendant from making unprovable assertions in the opening statement. It's also relevant that the defendant did read the desired book excerpt in full in his closing argument. And the record citation for that is C631 to 632. So any prejudice that may have resulted from the ruling on the opening statement, there can be no finding of prejudice where the defendant read that excerpt in his closing statement. Thus, the defendant cannot prove that the ruling on the opening statement was a material factor in his conviction if the excerpt was read in his closing argument. With regard to Issue 2, the defendant was sentenced only on Count 2, vehicular invasion, predicated on aggravated battery in a public way. Because he was not sentenced on any count, including the victim's age as an element, there's no final judgment and there can be no appeal on the question of whether the state proved beyond reasonable doubt that the defendant knew that the victim was over 60 years old. The state's argument that the state did prove that factor beyond reasonable doubt is contained in the People's Answer Brief. Then finally, with regard to Issue 4, sentencing, Count 2, on which the defendant was sentenced, was a Class 1 felony pairing a possible sentence of 4 to 15 years imprisonment. The defendant was sentenced to 100 days imprisonment and 4 years probation, and it claims that his sentence was excessive. But that claim must fail because it was within statutory limits and is not manifestly disproportionate to the nature of the offense. The court found as an aggravated factor that the defendant's testimony was not credible and found as mitigating factors the defendant's lack of criminal history, the fact that the conduct did not cause serious harm, and defendant's poor health. I'll say that again. The court did find as a mitigating factor defendant's poor health. And what the defendant here is asking this court to do is to re-weigh the factors in aggravation and mitigation that the court found after, as the defendant said today, a four-day sentencing hearing in which the trial court remarked that he had heard more character evidence related to this matter than he had heard in his career on the bench previously. The defendant also today states that this matter really was a case involving two people fighting, but on appeal all facts are taken in the light most favorable to the state. The victim testified otherwise, testified that it was the defendant who was the aggressor and that he was not an aggressor, and the jury is presumed to have found otherwise, to have found that the defendant was the sole aggressor. And then finally, with regard to these subsequent medical problems that the defendant incurred after he was sentenced, the circuit judge can hardly be reviewed on the basis that he could not have foreseen what would have befallen the defendant. Also, the defendant was granted a medical furlough and then subsequently was released on home confinement, and so the defendant did win relief based on these subsequent medical events. Yes, he remains on probation, but the defendant is not claiming that this portion of the sentence was excessive or that his medical problems forbid him from serving that. And so for those reasons, the court should affirm the defendant's convictions and sentence. Thank you. Mr. Campbell, do you have any further questions for him? Just briefly. The thing that bothers me and scares me about this video, this DVD, is either it existed or it didn't. If it didn't exist, then you've got to accept the proposition that the state policeman took the time to categorize it, to inventory it as 1270-60. What the judge said is, I don't care what the police officer did. I don't care what law enforcement did. I'm saying there is no video in existence. Therefore, we're going to proceed as if there was no video in existence. That's completely, completely contrary to the facts. You've got law enforcement officers who are trained how to do their job. They're trained how to inventory things. He wrote down the number, and there was a DVD, video, whatever you want to call it, in existence. There is also a record that he showed and sent that to the state's attorney. And then the state's attorney continued to deny for almost two years before trial.  It would be a dangerous precedent to allow the facts in this case to stand and not to reverse the way the court ruled at the trial level. Don't you think, though, the problem you have is that if this was a video of the crime itself as charged versus an arrest, that's your problem? Well, there's no question that this is a video, in my opinion, of subsequent investigation. You're right. It isn't of the event. It's of the arrests, questions, the inflection of his voice, his response that he offers, and then saying, you know, the guy tried to hit me with the door. We don't know. Did he bring that out in testimony? He did not. Again, representing himself, he did not. But he went through a number of things and came close to saying, you know, his theory is that these guys are trying to frame him. That's the gist of it. In effect, he could have been talking about the things that he would have told the trooper that were in self-defense, giving an affirmative defense in self-defense, to tell the jury. That's all kind of hindsight, though, when you're dealing with a waiver problem. Absolutely. But I think he was so—he'd been preparing for this for a year and a half, and on the second day of trial, they say, you're not going to get into that video. And he's like, my experience with the state's attorney's office is they don't give me complete discovery. It happened in the CNN case. Now it's happening in this felony case. And here's proof of it. Here it is on the police officer's report. And then they went back to him and said, we don't even accept your basic proposition that there's an existence of a video. I say it wasn't a video. I say it was inventory. I say it was logged in. And the state's attorney wants it. I'll just leave it at that. With regard to—well, I'll leave it at that. Thank you for your patience and your attention. Thank you for your brief self-argument taking matter under fire.